23-2373, Mehr v. Rassini, Mr. Lorelli, please proceed. May it please the Court, good morning, Mark Lorelli on behalf of the appellants, and there are three things that I'd like to discuss this morning. First is the claim construction disconnect, and then the paragraph, second is the paragraph in the final written decision about tensile loading in the installed state, and finally I want to discuss Claim 10. We enter this claim construction dispute in an awkward situation because we read page 23 of the final written decision and we agree with it completely. Where the board said our proposed claim language, specifically our clause, when vertical forces are introduced from a wheel carrier of a vehicle while in its installed state, to a great extent simply reiterates what is already expressly recited in Claim 1. Well that and, but one or two pages later what they also say is even accepting your claim construction, we still find it obvious. So it struck me, the time you get to page 25, it's like, okay, well let's look at what they said there. So I hope you'll have a moment to respond to the board, not just to the claim construction issue, but what the board said, even using your claim construction. I do, but I'll address it at least to a certain extent right now. On page 25, it's as we set forth below, they find in the installed state, it's still met, that we go later in the final written decision, and there's one paragraph that says that, and it cites a paragraph only in the rebuttal declaration, and we believe that's superficial and not supported by substantial evidence, and that's why the claim construction makes a difference. And I will get into that in some detail. When we start with the claim construction, and we start with looking at the claim itself, the claim is very specific, wherein the leaf spring, with an increasing load due to vertical forces introduced from the wheel carrier, the leaf spring is increasingly subjected to tensile loading. And it's explained earlier in the claim that the leaf spring is configured to accommodate the wheel carrier in the installed state. Quite simply, forces from a wheel carrier can only be introduced to a leaf spring when it's in the installed state, and I think that's what led to that statement from the board on page 23 of the decision. And if we think about it more, and we think about what the construction of tensile loading is, that was agreed by the parties, it says when the horizontal components of the reactive force imposed on each leaf spring. Well, the reactive force comes from something, and it comes from what is imposed on that spring in the installed state by the vehicle, by the wheel carrier. And that is really the construction that we seek, and what the board found was expressly in the claim. Now, we don't believe it's an intended use, we don't believe it's just capability. It's very important that when we read through the final written decision, the board talked about, in adopting what the petitioner brought forth, is that if there's sufficient force, if there's sufficient deflection, then this would be experienced. Well, those are a lot of ifs, and I don't think that the claim when it talks about when the vertical forces are introduced from a wheel carrier is about ifs, it's about actual forces. But to make sure that we're right, we go to the specification, something that the final written decision didn't do. The specification talks about the importance of the leaf spring and tensile loading while installed on the vehicle, and it expressly states at column 2, line 33 to 38, that it applies for at least a part of the entire spring travel that is possible. Well, it's possible if it's installed on a vehicle, otherwise anything would be possible. And of course, the summary of the invention talks about the benefits of the claimed invention as advantageous on driving comfort and driving stability. Again, the claim would not mean anything if it wasn't in the installed state on a vehicle. And of course, this court instructs that we should construe claim terms so that we have the patent's express purpose of the invention in mind. Now, I think there's been some confusion of elements, because on the one hand, the board says, we agree in the sentence after I read it to begin this argument, claim 1 expressly states that leaf spring and that tensile loading would occur due to load, due to vertical forces introduced from the wheel carrier when the leaf spring is in an installed state. And then, on the next page, the board says, we're not going to have that as part of our claim construction, because they believe that that's superfluous and alters the plain meaning of the claims. I can't grapple and understand what happened. So when I go through and think about it and think about what the appellee put in their response brief, they make a big statement about, well, that means one leaf spring could infringe if it's used in the installed state in one vehicle and not infringe if it's used in the installed state in another vehicle. And they don't cite anything to the court, because in my view, that's fine. We have a lot of case law, and we've cited some of it in our case. You can determine how a device operates and whether the device infringes based on how it operates, and in this instance, how it has reactive forces when impacted with vertical forces from a wheel carrier in the installed state. And we cited some other cases to the court about this, as I think the claim language is the same. You evaluate the claim language when certain things happen. We talked about forced labs, which is about when something is in a dried form. It doesn't have to be in a dried form to infringe, but you evaluate the claim term when something is in dried form. Jack Frost talked about when something is exposed to a microwave. And then, of course, there's the Bell aerosol case that talked about when a lid is removed. What you haven't talked about yet is what I construed the Board is heavily relying on, which is the competing expert testimony. And it's heavy reliance on Dr. Wagner, the other side's expert, right? So do you have anything to say about that? I do. When the Board went through its decision on the claims, it repeatedly said, our expert, what he put forward, didn't matter because of the claim construction. I think he said numerous times. It's irrelevant whether the spring would break. It's irrelevant whether the spring had enough travel in the installed state. It was irrelevant whether the spring went through, snapped through, because as the Board construed, it is just capability in the abstract. So that's the first instance. Now, I would like to directly address your earlier question about the Board saying it didn't matter whether it was in the installed or uninstalled state. If we go through the entire final written decision, and we go to what's found at APX 65, before it said, as discussed below, we have to go all the way to APX 65 to find the paragraph that the Board addressed the installed state, and we can talk about that in some detail. It said that they credit Dr. Wagner's response that the Enmoto leaf spring is capable of transitioning given the appropriate structural dimensions, material characteristics, and vehicle displacement upon which he relies. Well, he relies on not the installed state, but in the abstract, whether a spring is going to get to tensile loading, not whether it breaks, not whether it has the right travel range, not whether it goes through, snapped through. But what they cited on that page, see Exhibit 1033, Paragraph 66, Dr. Wagner testifying that one skill in the art would know that routine design in dimensions and materials would be performed for each specification application to match the intended displacement and loads for that vehicle. We don't think that's sufficient. That's not substantial evidence. The citation to that one paragraph that actually doesn't discuss Enmoto discusses a different prior art reference. But that's all the Board relied upon, is that routine design in dimensions rendered this claim obvious in the installed state. We believe that's against the law, and we also believe it was improperly decided based on the rules of the IPR. What law is it against? Personal web services talking about routine design in dimensions doesn't make something – if somebody could, through routine and design, create something, doesn't make creating that thing obvious, or doesn't provide a motivation to make that thing. There needs to be more. There needs to be some teaching, motivation, suggestion in the art. Why would they do that other than to meet the limitations of the claim? This came about – it's interesting that it's one single paragraph that the Board said at the end of the claim construction argument, we're going to get to this later, and then when they get to it later, it's one single paragraph. Because if you go to the petition, the petition doesn't talk about adjusting through routine design in dimensions the factors of MOTO, it doesn't discuss it one bit. In the reply, there is that statement in paragraph 66. My client moved to strike that reply declaration, specifically that paragraph. It was not – the motion to strike was not granted. In fact, the petitioner didn't even address that paragraph and why it should be in there. And that's in the record. But the fact of the matter is we never had the opportunity to address such an obviousness position, this routine design in dimensions position. And in Ray Nuvasiv talks about if it's not in the petition, and it's not something that is expected to be responded to through the course of the IPR, but is instead a new position, which this is because it's all the Board relied upon. But it's responsive to Mr. Dilling's assertions, right? Board seemed to understand that this statement from Dr. Wagner was responding, as a rebuttal properly can, to the presentation of evidence by Mr. Dillings about what the initial inputs and assumptions were. It seems okay. I understand the case law that you're making that comment from. I say this is different, and this is different because it's not responding in that paragraph in the final written assessment. It's not responding to what we said. It's creating a obviousness position based on routine design in dimensions for this installed state claim construction, something that was not in the petition. So that's why I think it's different, Your Honor. And I think it's inappropriate for us not to have an opportunity to respond, but I also think globally it's legally insufficient. Did you want to save any time for rebuttal? I do, and I will address just Claim 10 quickly, and that is Claim 10 states that the leaf spring is subjected to certain things or designed such that it's subjected to certain things. The Board just simply said capability is sufficient to meet that claim language, and we believe that's clear error. Thank you, Your Honor. Okay. Mr. Artz. Good morning, Your Honors. May it please the Court, John Artz on behalf of Appalee Racini. I think it's appropriate to start with a quote from the Parker Vision case that says, Apparatus claims cover what a device is, not what a device does. Because it seems to me that the principle dispute we have here involves whether or not the claims of the 330 pad, which relate to a leaf spring assembly, a structure, whether or not the claims relate to capability, as the Board found, or whether it relates to actual use. And maybe putting a finer point on it, the issue is whether or not the claims of the 330 pad encompass a leaf spring assembly, where the leaf spring is capable of tensile loading based solely on its structure and the way the ends are retained, as the Board found, or, as Muir asserts, measuring compliance with the claim based on the leaf spring being installed in a vehicle suspension and being actually subjected to actual use. And then, based on that, the Board found that under either construction, whether it adopted the capability or whether it adopted the installed state, the Board found that Enemoto rendered the claims obvious. I just want to briefly talk about the claim construction issue. The claim construction issue was consistent, as the Board found, with the intrinsic evidence with the claims, with the specification, with the file history, and I'm going to start with the file history. The file history that went through, the first rejection, the examiner rejected based on a land reference, and in doing that, he found that land, or submitted that land taught all the elements of the claim, including, except for FRP, which he found to be obvious, but that land, because its ends were fixed, was inherently believed to be subject to increased tensile loading. And then, after they overcame the land rejection, he cited the Greco reference, and the examiner said the same thing, that the spring of Greco is inherently believed to be subject to increased tensile loading as the vertical load on the vehicle is increased, and he went further and said in the same office action, that with an increasing load due to vertical forces introduced from the wheel carrier, it was increasingly subjected to tensile loading, which the examiner found to be capable, and that's Appendix 759. We submit that the Board's construction is consistent with the intrinsic evidence, and I didn't hear counsel point to anything that seemed to indicate that there was any inconsistency. He pointed to the specification, obviously the claims are to be interpreted based on the claims, and not limited or narrowed based on the specification. Talk about the evidence that the Board looked at to render the claims obvious, whether it be under a capability or whether an installed state. We don't agree that there was just a paragraph that the Board referenced. What Dr. Wagner opined, and what was presented in the petition, is that a leaf spring that has the structure set forth in the claim that is retained to prevent lateral movement at both ends is going to inherently tensile load. That's what the claim is, that's the result. This is like the Texas Instrument case, where it's in the whereby clause that tells you what the result of the structure of the claim is, and Enomoto meets that structure. As Dr. Wagner set forth, and as the Board found, Enomoto includes the same structure as the leaf spring set forth in the claim, it has the ends retained to prevent lateral displacement. But he didn't just base it on that, he looked at the figure of Enomoto within the suspension disclosed in Enomoto and said, looking at it based on what the patent teaches of where it would go from compression to tension, it appears based on Enomoto itself, a visual inspection, that Enomoto would go into tensile loading and thus meet the claim in the installed state which Enomoto is. Then he went further, and he did an FBA analysis and confirmed his visual inspection that within the suspension of Enomoto, it would actually go into tensile loading. That's what the Board credited. It also looked at the competing analysis of the FBA of Mr. Dilling, and it credited Dr. Wagner's as rendering Enomoto obvious and said, while Dilling's may be correct based on the assumptions, Dr. Wagner's evidence in his rebuttal testimony overcame that. So regardless of the claim construction, we believe that there's substantial evidence that supports the obviousness finding. I'm just going to address Claim 10 briefly because Claim 10 is not an issue, at least the issue that they're presenting now was not anything that was raised before. In their patent owner's statement, Claim 10, they just simply said, for all the reasons set forth in Claim 1. They're now trying to raise a new argument that's designed to, somehow or another, has some different meaning that was never presented in its patent owner's statement and was never raised until it presented it in its blue brief. So it's not proper, but it's also incorrect. Unless your honors have any questions, I will defer the rest of my time. Thank you, Mr. Artz. Thank you. Mr. Torelli, you have two minutes for rebuttal time. Thank you. Just a few points, and I'll start with Claim 10. Claim 10 is designed such that the spring travel has one reaction in one spring range and has another reaction in another spring range. All the argument all along was that it has to be, the spring has to be created so that in the installed state it does these things. That is the argument that was raised. The board, instead of applying the claim as written, just said this claim is met by capability. If you followed the initial claim construction, that's one thing. You can't then look at Claim 10 that has different language and say that you should follow the claim construction of Claim 1 when Claim 10 says designed such that. We believe that's clear error. The language of Claim 10 was never applied. I believe they tried to raise forfeiture, but those forfeiture cases were about when a party fails to raise a claim construction position that, I think one example was, was a specific definition from the specification. We're not making those types of arguments. All we're saying is that the board never applied the plain language of Claim 10. Well, can you tell me where you made that argument in your Patent Owner Response? In the Patent Owner Response. The only place I see is 1818. I'm going to try and help you because you have a little bit of time. On 1818, it was argued that intentional loaning for the same reasons set forth above, if I'm remembering it correctly, for the same reasons set forth above, because above we were arguing that when something happens in the installed state, it's got to be intentional. It's not something that's inherent that would happen in the abstract. It's got to be intentional. Well, for the reasons above, which were the reasons that pertain to Claim 1, so I mean I guess now I see your argument having shifted to be that Claim 10 has language that distinguishes it from Claim 1, so that even if Claim 1 were obvious, Claim 10 should not be, but I don't see you having made that separate argument at all in the Patent Owner Response. I believe the argument is made in the context of the facts of Claim 1, where we were arguing that Claim 1 should have the requirements of the installed state and an actual operation. It's the same... So does that mean I have to... You can only win on Claim 10 if I definitely adopt your claim construction for Claim 1. Are you now admitting that your Claim 10 argument is not distinct from your Claim 1 argument? No, actually I think it's the opposite, Your Honor. I think Claim 10 bolsters our argument for Claim 1. But I understood your Claim 10 thing. I think you started here, maybe I'm confused, is that they didn't look at the words. They didn't look at the words design such that, and I think the Chief was trying to see whether you made that argument in your Patent Owner Response, and I don't think I heard that in terms of what you described. We did not make it as a claim construction position because the ordinary language or the ordinary construction of design such that, as this Court has in other decisions, design such that is much different than capable of. And we don't need a claim construction position to basically present that the claim itself should not be met for the same reasons factually that Claim 1 was not met. Okay, thank you very much. I thank all counsel. This case is taken under submission.